Filed 6/27/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| CITY OF VALLEJO,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SOLANO COUNTY,<br><br>    Respondent;<br><br>AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA,<br><br>    Real Party in Interest. | A171451<br><br>(Solano County<br>Superior Ct. No. FCS059257) |
| AMERICAN CIVIL LIBERTIES UNION OF NORTHERN CALIFORNIA,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SOLANO COUNTY,<br><br>    Respondent;<br><br>CITY OF VALLEJO,<br><br>    Real Party in Interest. | A171570<br><br>(Solano County<br>Superior Ct. No. FCS059257) |

In 2020, allegations surfaced that certain officers within the Vallejo Police Department were bending a point of their star-shaped badge after using potentially lethal fire power during a police action.  The department

1

promptly retained an independent third party to investigate the alleged practice, but did not make the results of the investigation public. The American Civil Liberties Union of Northern California (ACLU) filed a request for records related to the investigation, including the written report prepared by the investigator, under the California Public Records Act (CPRA) (Gov. Code, § 7921.000 et seq.). The department released some records but maintained the bulk of the materials sought—including the investigative report—are confidential peace officer personnel records statutorily exempt from public disclosure under the *Pitchess*[1] statutes. (Pen. Code, §§ 832.5, 832.7, 832.8.)[2] The ACLU filed a petition for writ of mandate in the superior court challenging the sufficiency of the department's response. After extensive briefing and several hearings, the court ordered disclosure of portions of the investigative report and related materials, with identifying information regarding officers and witnesses, and their families, redacted. Neither party is satisfied with the superior court's ruling, and both seek writ review by this court.

The principal issue before us is whether the materials sought by the ACLU are records "relating to" the "report, investigation, or findings" of "an incident involving the discharge of a firearm at a person by a peace officer or custodial officer," and therefore subject to public disclosure under 2018 amendments to the *Pitchess* statutes, codified as section 832.7, subdivision (b). The secondary issue is whether, if we conclude the requested records are subject to public disclosure under section 832.7, subdivision (b), police officer names were properly ordered redacted.

---

[1]  *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

[2]  All further statutory references are to the Penal Code unless otherwise indicated.

We conclude the documents sought are not confidential personnel records, but instead personnel records that are now subject to public disclosure under section 832.7, subdivision (b). We further conclude the redaction of officer names cannot be sustained on the grounds relied on by the superior court. However, given the magnitude of the potentially disclosable materials in these proceedings, and the minimal briefing by the parties on issues of redaction, we shall remand for further proceedings in this regard.

## BACKGROUND[3]

### *The Badge Bending Investigation*

The parties largely agree on the pertinent facts. In July 2020, Open Vallejo, a local news outlet, published an article alleging a secretive group of officers within the police department "commemorated fatal shootings with beers, backyard barbecues, and by bending the points of their badges each time they kill[ed] in the line of duty." (King, *Vallejo police bend badges to mark fatal shootings* (July 28, 2020) Open Vallejo <https://openvallejo.org/2020/07/28/vallejo-police-bend-badge-tips-to-mark-fatal-shootings/> [as of June 27, 2025] (*Open Vallejo*).) Members of this group reportedly called a badge modified in this way a " 'Badge of Honor.' " One source described the purpose of the practice as follows: " 'The cops who shoot someone bend the tabs on their badges[.]' . . . 'Kind of like a notch on the bedpost. It's an indicator to each other how many hoodlums they've shot. They think it's funny.' " (*Ibid.*) An attorney for the Vallejo Police Officers

---

[3] To the extent our discussion references information that was filed with this court under seal, we modify our sealing orders to allow for its dissemination in light of our conclusion that the materials sought are disclosable under section 832.7, subdivision (b). All other portions of the sealed record shall remain sealed pending further order of this court.

Association disagreed with this supposed purpose of the practice, stating it had been done to signify officers " 'surviving officer-involved shootings' and not deaths by their hand." (St. Clair, *VPOA attorney says badge bending occurred at Vallejo Police Department, but for a different reason* (July 30, 2021) Vallejo Times Herald <https://www.timesheraldonline.com/2021/07/28/attorney-says-badge-bending-occurred-for-vallejo-police-department-but-for-a-different-reason/> [as of June 27, 2025].)

The media report of the badge-bending practice was made during a time of escalating concern about the culture within the city's police department. The previous month, then-Attorney General Xavier Becerra had announced an " 'expansive review' " of the department's policies, practices, and procedures. (*Open Vallejo.*) Current and former employees reportedly described "a department where bullies thrive[d], whistleblowers [were] dealt with harshly, and the pressure to shoot and kill civilians [was] strong." (*Ibid.*) One current member of the department told Open Vallejo, " 'Some days I feel like I work with a bunch of thugs who take pleasure out of hurting people.' " (*Ibid.*)[4]

Within days of the Open Vallejo article, the police department issued a press release announcing an independent, third-party investigation into the allegations of badge bending, a practice the chief of police called " 'very troubling and disturbing.' "

The department subsequently hired former Sonoma County Sheriff Robert Giordano to conduct the investigation and make findings as to

---

[4] The ACLU referenced a number of other media reports and investigations on shootings by city officers. We need not, and do not, consider this material in resolving the issue before us.

4

whether any department policies were violated. The investigation was opened as an internal affairs investigation, and it focused on officers who had been involved in shootings during the previous 17 years. To this end, Giordano requested information from the department about officers involved in " 'critical incidents' " involving shootings. Fourteen officers were issued interview notices stating, " 'it is alleged that you potentially violated Vallejo Police Department policies . . . including but not limited to . . . Department Policy 300,' " which governs the use of deadly force. (Italics omitted.)

The investigator ultimately prepared a 167-page report with one supplement and 27 attached exhibits (the "investigative report"). The investigator found the alleged practice of badge bending had, indeed, occurred and " 'related to the officer's action of firing a weapon in a critical incident regardless of whether a suspect was hit, injured, or killed.' " He further found, however, there was insufficient evidence to characterize the practice as celebratory of shooting incidents. Rather, he found the practice was " 'a manner of recognizing an officer involved in a shooting who did their job in a stressful situation, did not "run from the fight," and survived.' " The investigator nevertheless found the practice troubling and that it presented a problem for the department, stating, "Modifying the badge to mark an officer's engagement and survival in a critical shooting incident . . . can be misinterpreted or send the wrong message about Vallejo PD officers' approach to use of force and the sanctity of human life, as it has here."

The investigator found no officer had violated the department's use of force policy. However, he did find six of the 14 officers who had been given notice variously violated policies related to "conduct unbecoming an officer" and unauthorized damage to department property. The other eight officers

5

who had been given notice were exonerated of any violation of department policies. No officer was disciplined as a result of the investigation.

As we recounted, the city did not make the investigative report or any of the related documentation public.

***Public Records Request and Response***

In mid-January 2022, the ACLU submitted a CPRA request to the police department for "all records" in its possession "pertaining to allegations of 'badge-bending' by officers involved in on-duty lethal shootings." Specifically, the ACLU requested:

"1. All records related to an internal investigation by Robert Giordano, regarding allegations of Vallejo police officers bending their police badges in response to their involvement in officer-involved shootings and deaths. This request includes but is not limited to:

"i. All reports (including supplemental reports) and findings regarding the badge bending allegations;

"ii. All records of interviews conducted as part of this investigation, including but not limited to audio recordings and existing transcripts of these interviews;

"iii. All photographs relating to the badge bending investigation;

"iv. All records pertaining to agreements, background materials, and instructions given to Giordano regarding the scope and purpose of his investigation; [and]

"v. All records documenting the potential witnesses who were interviewed as part of Giordano's investigation.

"2. All records of internal *or* public complaints alleging a practice of badge bending amongst Vallejo Police Department officers in response to police-involved shootings. This request applies to the time period of January 1, 2010, to the present.

"3. All communications by Department employees regarding allegations of badge bending, from January 1, 2010, to the present. 'Communications' includes but is not limited to electronic mail, written letters, press releases, text messages, and social media messages or posts. We specifically request records pertaining to badge bending that contain any of the following terms: 'badge bending,' 'John Whitney,' 'Whitney,' 'Open Vallejo.'

"4. All Vallejo Police Department policies regarding the use, maintenance and/or replacement of police badges.

"5. All records of police badge replacement orders and requests for badge replacement from January 1, 2010, to the present. This request includes the names of police officers for whom badge replacements were requested, as well as dates of such requests."

The department provided the following materials: Giordano's contract; department policies regarding the use, maintenance, and replacement of police badges; records related to badge replacement orders and requests; and non-exempt records of responsive communications. It claimed all other responsive documents were confidential peace officer personnel records exempt from public disclosure under sections 832.7, subdivision (a), 832.8, subdivision (a)(4), and former Government Code sections 6254, subdivision (k) and 6255, subdivision (a) (now Gov. Code, §§ 7927.705 & 7922.000).

Two months later, in March, a retired Vallejo police officer was called to testify at an Evidence Code section 402 hearing in a criminal case in which the defendant was charged with the attempted murder of an officer. The defendant claimed he fired in self-defense, having first been fired upon by an officer, and he sought to elicit testimony about the practice of badge bending. The retired officer testified he was the individual who had initiated the practice of badge bending, bringing it from another police department where he was previously employed. When asked about the purpose of the practice, the retired officer stated it was about " 'being in a shooting.' " " 'It was—it was about whether—you know, right, wrong, or indifferent, a lot of people don't know if when they get to that point in—if and when they get to that point in their career that they'll actually perform or they'll freeze. And that's what it was about.' "

The defendant also wanted to introduce the investigative report. However, after reviewing the report in camera, the trial court refused to

7

allow it, concluding it was a confidential peace officer personnel record under section 832.7, subdivision (a).

Six months after the retired officer testified, the ACLU, in November 2022, filed the underlying verified complaint and petition for writ of mandate against the City of Vallejo and the police department (collectively, the "city") challenging the sufficiency of the police department's response to its CPRA request. The ACLU disputed the department's claim that the withheld documents were confidential peace officer personnel records under section 832.7, subdivision (a). Rather, the ACLU maintained the records "relat[ed] to" an investigation of "[a]n incident involving the discharge of a firearm at a person by a peace officer or custodial officer" and thus were subject to public disclosure under section 832.7, subdivision (b)(1)(A)(i).

**Pitchess** *Motion and Remaining Issues*

More than a year later, in December 2023—and pursuant to a stipulation by the parties as to how to move forward procedurally—the superior court heard and ruled on a *Pitchess* motion by the ACLU seeking materials relevant to its CPRA arguments. The ACLU provided the court with the amended privilege log the police department had provided and requested an order compelling the department to make the following records available for examination by the court: all drafts of the investigative report; witness interview notices and transcripts; disciplinary recommendations, notices, and records of any disciplinary proceedings; documents withheld as peace officer personnel records under section 832.7, subdivision (a); and amended responses to the ACLU's first set of requests for admissions and

8

special interrogatories previously objected to on the basis of that statutory provision.

The ACLU acknowledged that for purposes of the *Pitchess* motion the materials requested were considered "personnel records" as defined in section 832.8 and that the issue before the superior court was whether they bore on the ACLU's claim that the records were subject to public disclosure under section 832.7, subdivision (b) as records related to an investigation of a police officer shooting. Among other things, the ACLU wanted to determine what prompted the independent investigation into badge bending, whether any disciplinary action had been, or could be, taken given the relevant statute of limitations on officer discipline, and whether, if some portions of the report were confidential personnel records under section 832.7, subdivision (a), other portions were reasonably segregable and thus subject to disclosure under the CPRA.

The city did not object to in camera review, but maintained the CPRA request was overbroad, failed to properly balance the competing interests of disclosure, confidentiality, and privacy, and sought officer personnel records that were confidential under sections 832.7, subdivision (a). It also pointed out it had already admitted in discovery the requested records were not generated in response to any citizen complaint. It additionally had admitted the police department had sufficient awareness of badge-bending allegations to have undertaken an investigation before July 2020 and therefore the limitations period on disciplinary action had run. The city offered the explanation that " 'persons authorized to initiate an investigation into the conduct had some information about badge bending prior to that date, however, they did not have information regarding who participated, how many badges were bent, by whom, or why the badges were bent.' " Finally,

9

the city pointed out any disclosure ordered pursuant to the *Pitchess* motion was subject to a statutorily mandated protective order limiting use of the materials to a court proceeding. (See Evid. Code, § 1045, subd. (e).)

Following its in camera review, the superior court ordered the disclosure of 19 pages of the 167-page investigative report, interview notices, a notice of subject status and waiver of rights, and 238 pages of correspondence primarily consisting of e-mails pertaining to gathering records and information. The disclosed pages from the investigative report included the background, methodology, timeline, and findings of the investigation, including findings related to specific violations of department policy. As to these materials, the court ordered redacted identifying information as to officers, witnesses, and the families of officers. It also issued a protective order precluding further release of the documents "to the public or anyone" absent a subsequent court order.

The superior court rejected the ACLU's threshold argument that no portion of the investigative report and related documents could be characterized as a "personnel record" under the *Pitchess* statutes since no discipline could be taken given the expired limitations period. The court reasoned that even if formal disciplinary action could no longer be taken due to the timing of the investigation (which looked at shootings that occurred over more than a decade), any finding of misconduct would still be part of the officer's permanent file; thus, such portions of the report fell within the statutory definition of a personnel record. The court also rejected the ACLU's argument that even if the requested documents could be considered personnel records, they were records of an investigation related to an officer shooting and therefore were subject to public disclosure under section 832.7, subdivision (b)(1)(A)(i). The court did not consider the independent

10

investigation "as sufficiently related to the discharge of a firearm to qualify for the exception." There needed to be unequivocal evidence, said the court, that the practice related to the discharge of a firearm and there would have to be an investigation into that specific incident.

At a February 2024 status hearing, the parties agreed most, but not all, discovery issues had been resolved through the *Pitchess* process. They also agreed remaining issues could be addressed through briefing. The following month, the ACLU propounded a final set of requests for admissions, focusing on whether discipline had been taken against any of the officers found to have violated departmental policy. The city served confidential responses.

### *Motion for Judgment*

Four months later, in June, the ACLU filed a motion for judgment supported by copious documentation. It requested a writ of mandate: (1) compelling the city to promptly disclose all non-exempt public records responsive to its CPRA request and (2) declaring that the police department had violated the CPRA by failing to disclose such records in a timely manner. It also sought attorney fees and costs under Government Code section 6259, subdivision (d) (now Gov. Code, § 7923.115) and Code of Civil Procedure section 1021.5.

The ACLU renewed its argument that the investigative report and associated records are not personnel records under the *Pitchess* statutes and therefore no statutory exception is required for their public disclosure. It also reprised its argument that even if the documents are personnel records under these statutes, they are subject to public disclosure under section 832.7, subdivision (b) as records "relating to" the investigation of "[a]n incident involving the discharge of a firearm at a person by a peace officer or custodial officer." (§ 832.7, subd. (b)(1)(A)(i).) It pointed to several documents

11

generated during the investigation—such as the request for identification of officers associated with " 'critical incident log' shootings," a request for factual descriptions of the officer shootings, and the related interview notices—as evidence the investigation focused on what relationship, if any, badge bending had to officer conduct during officer-involved shootings. For example, the interview notices informed officers they were being investigated not only for potential violations of departmental policy regarding duty badges but also for possible violation of departmental policy on the permissible use of deadly force. The ACLU further asserted the practice could be probative of an officer's state of mind during or after a shooting. It also acknowledged portions of the report were reasonably segregable such that "individual officer information may be redacted while properly disclosing generalized information regarding the [d]epartment's historic awareness of badge-bending and any actions (or inaction) in response."

The city continued to maintain the investigative report and associated records are confidential personnel records under sections 832.7, subdivision (a) and 832.8, subdivision (a)(4) and are not personnel records related to an investigation of a police officer shooting under section 832.7, subdivision (b). It pointed out rulings had already been made (in unrelated criminal cases and in conjunction with the *Pitchess* motion) that the report and associated documents did not qualify as non-confidential personnel records under section 832.7, subdivision (b), with the courts variously stating the report was only "tangentially" related to any shooting, did not come within the precise wording of the statute, and was "sufficiently distinct from officer shooting incidents and their reasonably foreseeable aftermath." Thus, while the city agreed the records generated in the course of the administrative investigation that invariably follows an officer-involved shooting come within subdivision

(b), it argued the independent investigator here was not charged with "re-examining whether an officer's conduct during a shooting incident was within policy."

While its motion for judgment was pending, the ACLU filed a motion for clarification that the protective order issued in connection with the *Pitchess* motion did not pertain to the city's responses to the ACLU's final set of requests for admissions. These responses had been made pursuant to an agreement by the parties that the city's responses would be covered by the *Pitchess* protective order, subject to the ACLU's right to seek a court order allowing disclosure. The city opposed the motion for clarification, asserting the responses, which related to discipline, constituted confidential personnel records under sections 832.7, subdivision (a) and 832.8, subdivision (a)(4).

In October, the superior court issued a tentative ruling granting, in part, the ACLU's motion for judgment.[5] At the hearing, the court stated that in ruling on the *Pitchess* motion, it had concluded most of the records sought were confidential personnel records under sections 832.7, subdivision (a) and 832.8, subdivision (a), and had ordered disclosed only those portions of the records that did not qualify as such records (and therefore fell outside the ambit of the *Pitchess* statutes). With respect to the city's final discovery admissions, the court ruled this information was disclosable and "very important for the public to know."

When asked by the ACLU why the court had not ordered all the records sought disclosed under section 832.7, subdivision (b) as records related to officer-involved shootings, the court stated the materials were only "indirectly related" rather than "directly related" to any investigation of a shooting. The

---

[5] The parties submitted written briefs and the trial court issued a tentative ruling on the ACLU's motion prior to the hearing on the motion.

court was also of the view the ACLU had everything that was relevant with respect to the investigative report, including the methodology, the timeline when badge bending occurred, the (anonymized) findings, and what the city did or failed to do after receiving the report.

The superior court issued its final order and judgment a week later, authorizing public disclosure of the materials that it had ordered disclosed following the *Pitchess* hearing, with identifying information pertaining to officers and witnesses, and their families, redacted. The court provided two reasons for the redactions. First, the identifying information qualified as confidential personnel records protected under sections 832.7, subdivision (a) and 832.8, subdivision (a)(4) because it might "affect potential advancement, appraisal, discipline, or references." Second, under the CPRA's catchall exemption (Gov. Code, § 7922.000), the court found the public interest in protecting the identifying information outweighed the benefit to the public from releasing it. The court also granted the ACLU's clarification motion, confirming it was free to make public the city's responses to the ACLU's final requests for admissions.

Both parties filed writ petitions in this court challenging various aspects of the trial court's ruling.[6]

## DISCUSSION

In its writ petition, the ACLU presses a single argument—that the records it seeks are subject to disclosure under amendments made to the

---

[6] Pursuant to the city's request, we issued a stay to the extent the court's ruling directed the disclosure of documents and unsealed the transcript of the hearing on the motion for judgment. We also ordered the ACLU's and the city's writ proceedings consolidated for purposes of briefing and disposition, issued an order to show cause and related briefing schedule, and subsequently authorized the filing of an amicus brief in support of the ACLU by Informed California, Inc. (d/b/a/ Open Vallejo).

*Pitchess* statutes in 2018 through the enactment of Senate Bill No. 1421 (2018–2019 Reg. Sess.) (Stats. 2018, ch. 988; Senate Bill 1421) and, specifically, the amendment requiring the disclosure of records "relating to the report, investigation, or findings" of "[a]n incident involving the discharge of a firearm at a person by a peace officer." (§ 832.7, subd. (b)(1)(A)(i).) The city, in its writ petition, argues to the contrary—that the records do not come within this recently enacted exception to the confidentiality of peace officer personnel records, but rather, are confidential personnel records under sections 832.7, subdivision (a), and 832.8, subdivision (a)(4), not subject to public disclosure. We begin our analysis with an overview of the relevant statutory framework.

## Statutory Framework

### CPRA

"Enacted in 1968, the CPRA grants public access to public records held by state and local agencies. ([Gov. Code, § 7920.000] et seq.) 'Modeled after the federal Freedom of Information Act (5 U.S.C. § 552 et seq.), the [CPRA] was enacted for the purpose of increasing freedom of information by giving members of the public access to records in the possession of state and local agencies. [Citation.] Such "access to information concerning the conduct of the people's business," the Legislature declared, "is a fundamental and necessary right of every person in this state." ' " (*Becerra v. Superior Court* (2020) 44 Cal.App.5th 897, 913 (*Becerra*).)

"Pursuant to the California Constitution, the CPRA must be 'broadly construed' because its statutory scheme 'furthers the people's right of access.' (Cal. Const., art. I, § 3, subd. (b)(2).) Nevertheless, the act does not confer an absolute right of access. As part of the CPRA, the Legislature included a provision declaring it was 'mindful of the right of individuals to privacy.'

15

(Gov. Code, § 6250 [now Gov. Code, § 7921.000].) This express policy declaration ' "bespeaks legislative concern for individual privacy as well as disclosure." [Citation.] "In the spirit of this declaration, judicial decisions interpreting the [CPRA] seek to balance the public right to access to information, the government's need, or lack of need, to preserve confidentiality, and the individual's right to privacy. [Citations.]" ' (*Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1282 . . . (*Copley Press*).)" (*Becerra, supra,* 44 Cal.App.5th at pp. 913–914.)

"The CPRA balances the dual concerns for privacy and disclosure by providing for various exemptions that permit public agencies to refuse disclosure of certain public records. (Gov. Code, §§ 6254–6255 [see now generally Gov. Code, tit. 1, div. 10., pts. 5-6].) For instance, the CPRA does not require agencies to permit public inspection of records that are exempted or prohibited from public disclosure pursuant to federal or state law, including Evidence Code provisions relating to privilege. (Gov. Code, § 6254, subd. (k) [now Gov. Code, § 7297.705]. . . .) Also, as discussed *post*, law enforcement investigatory files were, until recently, categorically exempted from the CPRA's general requirement of disclosure. (Gov. Code, § 6254, subd. (f) [now Gov. Code, §§ 7923.600–7923.630]. . . .)" (*Becerra, supra,* 44 Cal.App.5th at p. 914.) In addition, the CPRA contains a "catchall" exemption that "authorizes the nondisclosure of a record when a determination is made by the public agency (or the court if the agency's determination is challenged) that 'on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record.' " (*Id.* at p. 928, quoting Gov. Code, § 6255, subd. (a), now Gov. Code, § 7922.000.)

16

***The*** **Pitchess** ***Statutes***

The Supreme Court's 1974 decision in *Pitchess* " 'recognized that a criminal defendant may, in some circumstances, compel the discovery of evidence in the arresting law enforcement officer's personnel file that is relevant to the defendant's ability to defend against a criminal charge.' " (*Association for Los Angeles Deputy Sheriffs v. Superior Court* (2019) 8 Cal.5th 28, 40–41 (*Los Angeles Deputy Sheriffs*).)

" 'In 1978, the Legislature codified the right' and defined 'which officer records are subject to *Pitchess* discovery.' [Citation.] 'The statutory scheme is set forth in Evidence Code sections 1043 through 1047 and Penal Code sections 832.5, 832.7, and 832.8.' [Citation.] These *Pitchess* statutes 'reflect[] the Legislature's attempt to balance a litigant's discovery interest with an officer's confidentiality interest.' " (*Los Angeles Deputy Sheriffs, supra,* 8 Cal.5th at p. 41.)

Section 832.7, specifically, creates "three categories" of confidential documents. (*Los Angeles Deputy Sheriffs*, *supra*, 8 Cal.5th at p. 44.) First, it reaches "personnel records of peace officers and custodial officers." (§ 832.7, subd. (a).) "Among other things, this category shields certain records that relate to '[e]mployee . . . discipline' (Pen. Code, § 832.8, subd. (a)(4)) or certain '[c]omplaints, or investigations of complaints, . . . pertaining to the manner in which [the employee] performed [the employee's] duties' (*id*., § 832.8, subd. (a)(5))." (*Los Angeles Deputy Sheriffs*, at p. 44.) "The second category of confidential information encompasses 'records maintained by any state or local agency pursuant to [Penal Code] Section 832.5.' (§ 832.7[, subd.] (a).) Section 832.5 'requires "[e]ach department or agency in [California] that employs peace officers [to] establish a procedure to investigate complaints by members of the public against the personnel of these departments or

17

agencies. . . ." ' " (*Id.* at p. 45.) "The third and final category of confidential information is 'information obtained from' the prior two types of records. (§ 832.7[, subd.] (a)]. . . .) 'In its ordinary sense, to obtain information means to come into possession of it.' [Citation.] Thus, the phrase 'information obtained from' certain records (§ 832.7[, subd.] (a)) 'is most reasonably read to encompass information that was acquired from' those records." (*Ibid.*) Such confidential records cannot be "disclosed in any criminal or civil proceeding except by discovery pursuant to Sections 1043 and 1046 of the Evidence Code." (§ 832.7, subd. (a); see *Becerra, supra,* 44 Cal.App.5th at p. 915.)

The *Pitchess* confidentiality statutes are not subordinated to the broad public right of access set forth in our constitution. (*Long Beach Police Officers Assn. v. City of Long Beach* (2014) 59 Cal.4th 59, 68 (*Long Beach*).) Rather, with respect to peace officer records, our constitution states: "Nothing in this subdivision [recognizing the right of public access to government records] supersedes or modifies the right of privacy guaranteed by Section 1 or affects the construction of any statute, court rule, or other authority to the extent that it protects that right to privacy, including any statutory procedures governing discovery or disclosure of information concerning the official performance or professional qualifications of a peace officer." (Cal. Const., art. I, § 3, subd. (b)(3).)

### Senate Bill 1421

In 2018, the Legislature amended the *Pitchess* statutes, and in particular, section 832.7, through the enactment of Senate Bill 1421. As amended, the statute generally retains confidentiality for peace officer personnel records—now set forth in subdivision (a)—but with significant exceptions—now set forth in subdivision (b). As pertinent here, subdivision (b) provides:

18

"(1) Notwithstanding subdivision (a), Section 7923.600 of the Government Code, or any other law, the following peace officer or custodial officer personnel records and records maintained by a state or local agency shall not be confidential and shall be made available for public inspection pursuant to the California Public Records Act (Division 10 (commencing with Section 7920.000) of Title 1 of the Government Code):

"(A) A record relating to the report, investigation, or findings of any of the following:
"(i) An incident involving the discharge of a firearm at a person by a peace officer or custodial officer.
"(ii) An incident involving the use of force against a person by a peace officer or custodial officer that resulted in death or in great bodily injury.
"(iii) A sustained finding involving a complaint that alleges unreasonable or excessive force."  (§ 832.7, subd. (b)(1)(A)(i)–(iii).)

Subdivision (b) goes on to specify the records that "shall be released pursuant to this subdivision" include: "all investigative reports; photographic, audio, and video evidence; transcripts or recordings of interviews; autopsy reports; all materials compiled and presented for review to the district attorney or to any person or body charged with determining whether to file criminal charges against an officer in connection with an incident, whether the officer's action was consistent with law and agency policy for purposes of discipline or administrative action, or what discipline to impose or corrective action to take; documents setting forth findings or recommended findings; and copies of disciplinary records relating to the incident, including any letters of intent to impose discipline, any documents reflecting modifications of discipline due to the Skelly or grievance process, and letters indicating final imposition of discipline or other documentation reflecting implementation of corrective action."  (§ 832.7, subd. (b)(3).)

The subdivision also includes a number of redaction provisions. For example, any disclosed records "shall" be redacted to "remove personal data or information, such as a home address, telephone number, or identities of family members, other than the names and work-related information of . . . officers," "preserve the anonymity of whistleblowers, complainants, victims, and witnesses," "protect confidential medical, financial, or other information of which disclosure is specifically prohibited by federal law or would cause an unwarranted invasion of personal privacy that clearly outweighs the strong public interest in [the] records," and protect the physical safety of officers where "there is a specific, articulable, and particularized reason to believe" disclosure "would pose a significant danger." (§ 832.7, subd. (b)(6)(A)–(D).) In addition, any disclosed records "may" be redacted in certain specified circumstances, including "where, on the facts of the particular case, the public interest served by not disclosing the information clearly outweighs the public interest served by disclosure of the information." (*Id*., subd. (b)(7).)

In 2022, the Legislature enacted Senate Bill No. 16 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 402), further amending section 832.7, subdivision (b) to include, in relevant part, records relating to incidents where there is a "sustained finding" against an officer involving prejudice or prohibited discrimination, an unlawful arrest or search, or failure to intervene against another officer using clearly excessive force. (§ 832.7, subd. (b)(1)(A)(iv), (D) & (E).)

***CPRA Jurisdiction and Standard of Review***

The instant writ petitions are before this court pursuant to Government Code section 7923.500, subdivision (a), which provides that a trial court order directing disclosure of public records held by a public entity "shall be immediately reviewable by petition to the appellate court for the

20

issuance of an extraordinary writ." Where, as here, statutory writ review is the "exclusive means of appellate review . . . an appellate court may not deny an apparently meritorious writ petition, timely presented in a formally and procedurally sufficient manner, merely because, for example, the petition presents no important issue of law or because the court considers the case less worthy of its attention than other matters." (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 114 (plur. opn.).) Thus, while appellate courts may, and regularly do, decide writ petitions summarily, when a writ petition constitutes the exclusive means of obtaining appellate review "an appellate court must judge the petition on its procedural and substantive merits, and a summary denial of the petition is necessarily on the merits." (*Leone v. Medical Board* (2000) 22 Cal.4th 660, 670.)

Our standard of review of a challenged ruling under the CPRA is well established. " ' "Factual findings made by the trial court will be upheld if based on substantial evidence. But the interpretation of the [CPRA], and its application to undisputed facts, present questions of law that are subject to [independent] appellate review." ' [Citation.] 'And when it comes to balancing various interests under the CPRA, while we accept the trial court's express and implied factual determinations if supported by the record, "we undertake the weighing process anew." ' " (*Edais v. Superior Court* (2023) 87 Cal.App.5th 530, 538–539; accord, *Becerra, supra,* 44 Cal.App.5th at pp. 913, 917.)

***The Officer Shooting Exception (§ 832.7, subd. (b)(1)(A)(i))***

As we have recited, the crux of the parties' dispute is whether the investigative report on badge bending and the documents related thereto are subject to public disclosure under section 832.7, subdivision (b) as "[a] record relating to the report, investigation, or findings of . . . [a]n incident involving

the discharge of a firearm at a person by a peace officer or custodial officer." (§ 832.7, subd. (b)(1)(A)(i).)

The ACLU maintains the records at issue fall squarely within this recently designated category of disclosable personnel records. It points to the seriousness with which the police department responded to the media report of badge bending, a practice the Chief of Police called " 'very troubling and disturbing.' " The department promptly retained an independent third-party investigator and opened an internal affairs investigation. A department press release announced the investigation as one into badge bending "after an officer-involved shooting occurs." The independent investigator focused his attention on those officers who were involved in officer-shootings over a 17-year time period. Some of these officers were notified they were being investigated for possible violations of department policy, including potential violations of the department's use of force policy. The investigation spanned the course of a year and cost the police department over $100,000. And while the independent investigator did not find the practice of badge bending violated the department's use of force policy, he did find the conduct of several officers violated other policies, including conduct unbecoming an officer. He also observed the practice was generally detrimental to public confidence in the city's police department. In short, as the ACLU sees it, the independent investigator was clearly "investigating the conduct of officers in shootings."

The city takes the view section 832.7, subdivision (b)(1)(A)(i) generally applies to records relating to the investigations that necessarily and promptly follow any police shooting. That is, it applies to records relating to investigations that focus on the specifics of a particular police action and on an individual officer's conduct during that action to determine whether the

22

officer's use of a firearm was within policy.  The Giordano investigation, argues the city, was not that sort of investigation because it was not case-or officer-specific and looked generally at conduct occurring after a shooting.  While the city acknowledges after-the-fact conduct may be relevant in an investigation of a particular shooting incident and also acknowledges there can be multiple investigations of a single shooting incident, it views the independent investigation into the practice of badge bending as only "tangentially related" to such incident-specific investigations.  Thus, as the city sees it, the investigation at issue here was "wholly distinct from the criminal and administrative investigations actually performed in connection with each shooting incident," the records of which it had already publicly released.

The rules governing our examination of section 832.7 are settled.  "Our goal in interpreting a statute is to effectuate the Legislature's intent.  [Citation.]  We look first to the statutory language, and if the language is clear and unambiguous, we adhere to its plain meaning unless a literal interpretation would result in absurd consequences.  [Citation.]  But when the statutory language is susceptible to more than one reasonable interpretation, we may consider other aids, including the statute's purpose, legislative history, and public policy." (*First Amendment Coalition v. Superior Court* (2023) 98 Cal.App.5th 593, 603.)  When initially considering the statutory language, we " ' " ' "do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment." ' " ' "  (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190 (*LoanMe*).)  Similarly, in our pursuance of the legislative purpose, " ' " ' "we consider portions of a statute in the context of the entire statute and the

23

statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act." ' " ' " (*Ibid.*)

When considering the exception to confidentiality set forth in section 832.7, subdivision (b)(1)(A)(i)—for records "relating to the report, investigation, or findings of . . . [a]n incident involving the discharge of a firearm at a person by a peace officer or custodial officer"—the question before us initially appears straightforward: How "related to" an investigation of an officer-involved shooting must a record be to come within this exception?

However, it is a question not so readily answered. The dictionary definition of "relate to" is "to be connected with (someone or something)**:** to be about (someone or something)" as in "The readings *relate to* the class discussions." (Webster's Dict. Online (2025) <https://www.merriam-webster.com/dictionary/relate%20to> [ as of June 27, 2025].) And it is no easier to quantify the necessary "connection" than it is the outer boundaries of the required "relationship." As the late Justice Scalia once observed in a similar context, "applying the 'relate to' provision according to its terms [is] a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." (*California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.* (1997) 519 U.S. 316, 335 (conc. opn. of Scalia, J.); *Id.* at pp. 334–335 (conc. opn. of Scalia, J.) [addressing state laws under ERISA which were preempted " 'insofar as they . . . relate to any employee benefit plan' "].)

Some California courts have interpreted the words "related" or "related to" broadly. (See, e.g., *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 868 (*Bay Cities*) [" 'Related' is a commonly used word with a broad meaning that encompasses a myriad of relationships."];

24

*City of Cerritos v. State of California* (2015) 239 Cal.App.4th 1020, 1054 ["The interpretation also conflicts with the ordinary meaning of the phrases 'relate to' or 'related.' In other contexts, such words have been found to be much more expansive than the interpretation plaintiffs urge."].) Indeed, the term has, in some cases, been held to include both direct and indirect connections. (*Simon Levi Co. v. Dun & Bradstreet Pension Services, Inc.* (1997) 55 Cal.App.4th 496, 510, 501 [interpreting " 'related to' " to include both direct and indirect impacts]; accord, *City of Cerritos,* at p. 1054.)

However, whether the term "related to" is ambiguous in a specific context depends on the circumstances of the particular case. (*Bay Cities*, *supra*, 5 Cal.4th at p. 868.) For example, in *Bay Cities*, our Supreme Court addressed an argument that the term "related" was ambiguous in an attorney's professional liability insurance policy "because it could have either a broad meaning, for example, meaning all services rendered by the attorney in connection with this particular matter, or, alternatively, a narrower meaning, that is, only those acts by the attorney that are causally related." (*Ibid.*, italics omitted.) The court found no ambiguity because the word was not "reasonably susceptible" to the narrower meaning advanced by the plaintiffs. (*Ibid.*)

Here, the exception to confidentiality in section 832.7, subdivision (b)(1)(A)(i)—for "[a] record *relating to* the report, investigation, or findings of . . . [a]n incident involving the discharge of a firearm at a person by a peace officer or custodial officer" (italics added)—does not contain any limiting language, which suggests a broad interpretation of "related to" is appropriate. (See *Bay Cities*, *supra*, 5 Cal.4th at p. 868 ["a word with a broad meaning or multiple meanings may be used for that very reason—its

25

breadth—to achieve a broad purpose"].)  However, based on the terminology alone, we cannot say definitively this is so.

We therefore consider the language in the context of the entirety of the statute.  (*LoanMe, supra*, 11 Cal.5th at p. 190.)  As discussed above, section 832.7 starts with a provision generally making the personnel records of peace officers confidential "[e]xcept as provided in subdivision (b)."  (§ 832.7, subd. (a).)  The statute continues: "Notwithstanding subdivision (a), Section 7923.600 of the Government Code [i.e., the CPRA], or any other law, the following peace officer or custodial officer personnel records and records maintained by a state or local agency shall not be confidential and shall be made available for public inspection pursuant to the [CPRA]."  (*Id*., subd. (b)(1).)  There follows a series of specific exceptions to the confidentiality otherwise afforded peace officer personnel records by subdivision (a).  In addition to the exception for records "relat[ed] to" investigations of officer involved shootings (*id*., subd. (b)(1)(A)(i)), there is also an exception for "[a]ny record relating to an incident in which a sustained finding was made by any law enforcement agency or oversight agency involving dishonesty by a peace officer or custodial officer *directly relating* to the reporting, investigation, or prosecution of a crime, or *directly relating* to the reporting of, or investigation of misconduct by, another peace officer or custodial officer, including, but not limited to, any false statements, filing false reports, destruction, falsifying, or concealing of evidence, or perjury."  (*Id*., subd. (b)(1)(C), italics added.)  Thus, the Legislature knows how to narrow the meaning of "related to"—by using the terminology "directly relating to"—when it wants to do so.  It did not, however, choose to utilize the more restrictive terminology in subdivision (b)(1)(A)(i), a strong indicator the more general terminology "related to" has a

26

"broad meaning that encompasses a myriad of relationships." (*Bay Cities*, *supra*, 5 Cal.4th at p. 868.)

While in our view, the plain language of the statute requires a broad reading of the term "related to," we recognize there is language that might arguably be urged as narrowing the reach of subdivision (b)(1)(A)(i) in the manner urged by the city.  Specifically, this exception is for "***A*** record relating to ***the*** report, investigation, or finding of any of the following: (i) ***An*** incident involving the discharge of a firearm at ***a*** person by ***a*** peace officer or custodial officer."  (§ 832.7, subd. (b)(1)(A)(i), boldface & italics added.)  Other exceptions similarly apply, for example, to "[***a***] sustained finding involving ***a*** complaint" and to "[***a***] sustained finding that ***an*** officer failed to intervene *against **another*** officer using force. . . ."  (*Id.*, subd. (b)(1)(A)(iii) & (iv), boldface & italics added.)  Use of the singular arguably hints that "the" report, investigation, or findings subject to public disclosure are those generated during the fact-specific and officer-specific inquiries that necessarily follow an officer shooting.  The statutory list of records that "shall be released pursuant" to subdivision (b) also hints as much, as it includes, for example, "all materials compiled and presented for review to the district attorney or to any other person or body charged with determining whether to file criminal charges against ***an*** officer in connection with ***an*** incident," and "any documents reflecting modifications of discipline due to ***the Skelly*** or ***grievance*** process"—the latter being the process by which *an* officer challenges an adverse outcome of an administrative investigation.  (*Id.*, subd. (b)(3), boldface & italics added.)  We also observe that another provision of subdivision (b) provides that "[a] record from *a separate* and *prior* investigation or assessment of *a **separate incident*** shall not be released unless it is independently subject to disclosure pursuant to this subdivision."

27

(*Id*., subd. (b)(4), boldface & italics added.) This language also suggests subdivision (b) exceptions pertain to personnel records generated during *an* individual investigation of *a* specific incident involving *a* particular officer.

Given the arguable ambiguity of the statutory language, we turn to its legislative history. (See *People v. Prudholme* (2023) 14 Cal.5th 961, 975 [" ' "when the words of the statute are susceptible to more than one reasonable meaning, . . . we consult other indicia of the [the enactors'] intent, including such extrinsic aids as legislative history and public policy," ' " quoting *People v. Henderson* (2022) 14 Cal.5th 34, 51].) As we shall explain, this history appears conclusive that the Legislature intended the terminology in section 832.7(b)(1)(A)(i) to have the broadest possible meaning and to encompass the records sought in this case.

"[T]he legislative history of Senate Bill 1421 discloses that, at the time the proposed amendments to section 832.7 were pending, the Legislature perceived California as 'one of the most secretive states in the nation in terms of openness when it comes to officer misconduct and uses of force.' (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 1421 (2017–2018 Reg. Sess.) as amended Aug. 23, 2018, p. 8 (hereafter Senate Floor Analysis).) In particular, the Legislature pointed to a 2006 Supreme Court ruling[7] interpreting section 832.7 as 'prevent[ing] the public from learning the extent to which police officers have been disciplined as a result of misconduct, and . . . clos[ing] to the public all independent oversight investigations, hearings and reports.' (Sen. Floor Analysis, p. 8. . . .)" (*Becerra*, *supra*, 44 Cal.App.5th at p. 920, italics omitted.) Thus, it is clear the Legislature viewed the then-existing lack of public access to records, and particularly those involving independent investigations, as a significant

---

[7] *Copley Press, supra,* 39 Cal.4th 1272.

impediment to transparency regarding officer misconduct and the use of force.

In the Legislature's view, greater transparency would promote important public policies. "As one legislative committee commented, Senate Bill 1421's author urged the bill's passage because it ' "benefits law enforcement and the communities they serve by helping build trust. Giving the public, journalists, and elected officials access to information about actions by law enforcement will promote better policies and procedures that protect everyone. We want to make sure that good officers and the public have the information they need to address and prevent abuses and to weed out the bad actors. [Senate Bill] 1421 will help identify and prevent unjustified use of force, make officer misconduct an even rarer occurrence, and build trust in law enforcement." ' (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1421 (2017–2018 Reg. Sess.) as amended June 19, 2018, p. 4 (hereafter Assembly Committee on Public Safety Report).)" (*Becerra, supra,* 44 Cal.App.5th at p. 920.)

"In contemplating the bill's effects, another legislative analysis stated: '[Senate Bill] 1421 opens police officer personnel records in very limited cases, allowing local law enforcement agencies and law enforcement oversight agencies to provide greater transparency around only the most serious police complaints.' (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1421 (2017–2018 Reg. Sess.) as amended May 25, 2018, p. 7. . . .) At least one Assembly committee report highlighted the language in Senate Bill 1421 providing that '*notwithstanding any other law,* [certain enumerated] peace-officer or custodial-officer personnel records are not confidential and shall be made available for public inspection pursuant to the [CPRA].' (Assem. Com. on Public Safety Rep., *supra,* p. 1, italics added.)

Underscoring this desire for greater access and transparency, . . . the Legislative Counsel's Digest for Senate Bill 1421 explained: 'This bill would require, notwithstanding any other law, certain peace officer or custodial officer personnel records *and records relating to specified incidents, complaints, and investigations involving peace officers and custodial officers* to be made available for public inspection pursuant to the [CPRA].' (Legis. Counsel's Dig., Sen. Bill No. 1421 (2017–2018 Reg. Sess.), italics added [by *Becerra*].)"  (*Becerra, supra,* 44 Cal.App.5th at pp. 920–921, some italics omitted.)

The legislative findings accompanying Senate Bill 1421, likewise, emphasize the importance of making serious officer misconduct and officer use of force records accessible: "(a) Peace officers help to provide one of our state's most fundamental government services.  To empower peace officers to fulfill their mission, the people of California vest them with extraordinary authority—the powers to detain, search, arrest, and use deadly force.  Our society depends on peace officers' faithful exercise of that authority.  Misuse of that authority can lead to grave constitutional violations, harms to liberty and the inherent sanctity of human life, as well as significant public unrest. [¶] (b) The public has a right to know all about serious police misconduct, as well as about *officer-involved shootings and other serious uses of force.* Concealing crucial public safety matters such as officer violations of civilians' rights, or *inquiries into deadly use of force incidents*, undercuts the public's faith in the legitimacy of law enforcement, makes it harder for tens of thousands of hardworking peace officers to do their jobs, and endangers public safety." (Stats. 2018, ch. 988, § 1, italics added.)

As our colleagues in Division Three have stated and as the foregoing demonstrates: "[T]he legislative intent behind Senate Bill 1421 was to

30

provide transparency regarding instances of an officer's use of significant force and sustained findings of officer misconduct by allowing public access to officer-related records maintained either by law enforcement employers or by any state or local agency with independent law enforcement oversight authority.  Moreover, in amending section 832.7, the Legislature sought to afford the public 'the right to know all about serious police misconduct,' to stop concealing incidents where an officer violated civilian rights, and to 'address and prevent abuses and to weed out the bad actors.'  (Stats. 2018, ch. 988, § 1; Assem. Com. on Public Safety Rep., *supra*, pp. 4, 6.)"  (*Becerra, supra*, 44 Cal.App.5th at p. 921.)

Clearly, these legislative goals are advanced by broadly construing the terminology in section 832.7, subdivision (b)(1)(A)(i) and reading the exception to encompass the records sought here relating to the Vallejo Police Department's independent investigation into the practice of badge bending that had for years followed some officers' use of deadly force.  Indeed, we cannot imagine the Legislature intended that such an investigation into a practice associated with police officers' lethal use of their firearms remain secreted from public purview.  The legislative history is replete with statements about the importance of transparency with respect to officers' "use of force" to help "build public trust" in law enforcement.[8]  (E.g., Stats. 2018, ch. 988, § 1; *Becerra, supra*, 44 Cal.App.5th at p. 920 [citing Sen. Floor Analysis, p. 8 & Assembly Com. on Public Safety Report, p. 4].)

---

[8] The superior court appears to have shared this same view, commenting, for example, that it "wanted people to understand that this goes back to 2003 and it wasn't dealt with for—really dealt with for 16 years"; that the "people" should "know how serious it was and how blase chief after chief was, and it took that long for this to be dealt with seriously"; and that it was "important for future chiefs and that they start taking this stuff seriously."

Whether or not the investigative report resulted in individual discipline is immaterial. The police department treated the investigation into badge bending as an internal affairs investigation, notified specific officers they were being investigated for possible violations of several department policies, including its policy pertaining to the use of force, and the independent investigator made findings as to whether these officers violated those policies. Given the Legislature's repeated emphasis on the public's "right to know *all about* . . . officer-involved shootings and other serious uses of force" (Stats. 2018, ch. 988, § 1, italics added), the Legislature could not have intended that an independent investigation into a " 'very troubling and disturbing' " practice following officer shootings would remain undisclosed because of delay in bringing the practice to light.

For the same reasons, it is immaterial that reading section 832.7, subdivision (b)(1)(A)(i) to include records of independent investigations such as that undertaken here could result in the disclosure of conduct occurring well after a shooting. Indeed, because an administrative investigation of an officer shooting must commence promptly, it could well have been the case that at least some badge bending occurred after administrative investigations were concluded. But, again, nothing in the statutory language, or in the legislative history, suggests the Legislature did not intend to bring to light practices associated with officer shootings that, for whatever reason, remained in the shadows.

Nor does it matter that there had already been individual administrative investigations of the shootings examined by the independent investigator, the records of which, the city points out, it had already made public. The language of subdivision (b) is not confined to the administrative investigations that necessarily follow officer shootings, and the legislative

32

history makes clear the Legislature could not have intended this statutory exception would not embrace the independent investigation conducted here into a practice associated with police shootings. For whatever reason, *this* practice had never been investigated, and the fact the specifics of individual shootings had been previously investigated is immaterial.[9]

Nor, finally, does the substance of the independent investigator's findings weigh in the balance as to whether his report and records associated therewith are subject to public disclosure under section 832.7, subdivision (b)(1)(A)(i). The Legislature has required public disclosure of records "relating to" the "report, investigation *or* findings" of incidents "involving the discharge of a firearm at a person by a peace officer." (§ 832.7, subd. (b)(1)(A)(i), italics added.) This directive is not, in other words, limited to records relating to reports and investigations of police shootings wherein the officer is found to have used excessive force or acted in violation of department policies pertaining to use of force. To the contrary, the statute

_____

[9] At oral argument, counsel for the city reiterated agreement that—for purposes of section 832.7, subdivision (b)(1)(A)(i)—an investigation of an officer-involved shooting could occur six months or a year after the conclusion of the standard investigations into that shooting should allegations surface that an officer might have been "improperly motivated." She also acknowledged that *actions* that did not occur during the shooting incident itself could be part of a section 832.7, subdivision (b)(1)(A)(i) investigation if they bore on an officer's motivation. Such an investigation would be covered by section (b)(1)(A)(i) as effectively a "reinvestigation of the shooting" that might result in changes to the findings made in the initial investigations that the shooting was within policy. While counsel suggested a situation where it was discovered after-the-fact that an officer had their own criminal motivation for a shooting, we can see no meaningful difference between that scenario and the investigation here, which focused on late-discovered allegations that officers were improperly motivated to "kill hoodlums" and "get a notch on their bedpost" as a result. Had this investigation reached a different conclusion, it might very well have led to reconsideration of prior findings that certain shootings were within policy.

requires public disclosure of records relating to *any* report, investigation, or finding of an incident involving an officer shooting. This stands in contrast with other provisions of subdivision (b) which are expressly limited to records relating to reports and investigations of a "sustained finding," for example, of the use of unreasonable or excessive force. (*Id.*, subd. (b)(1)(A)(iii).) As the legislative history makes clear, the Legislature's purpose in enacting section 832.7, subdivision (b)(1)(A)(i), specifically, is to require *transparency* when it comes to officer shootings to foster greater public trust and confidence in law enforcement. In this regard, the substance of the investigator's ultimate findings matters not. To the contrary, the public's "right to know *all about* . . . officer-involved shootings" (Stats. 2018, ch. 988, § 1, italics added) is served as much by an investigation or report that determines an officer complied with the law and all department use of force policies, as it is by an investigation or report that determines the opposite.

We therefore conclude the records the ACLU seeks are generally subject to public disclosure under section 832.7, subdivision (b)(1)(A)(i).[10]

### *Redaction of Officer Names*

Having concluded the records at issue are generally subject to public disclosure under section 832.7, subdivision (b)(1)(A)(i), we turn to the secondary issue before us—redaction.

As we have recited, subdivision (b) has a number of redaction provisions. Some are mandatory. An agency "shall redact a record disclosed pursuant to this section" for "any of the following purposes: (A) To remove

---

[10] We therefore need not, and do not, address the ACLU's additional claim that portions of the investigative report are disclosable as a record pertaining to a "sustained finding . . . [of] dishonesty . . . by a peace officer . . . directly relating to the reporting, investigation, or prosecution of crime." (§ 832.7, subd. (b)(1)(C).)

personal data or information, such as a home address, telephone number, or identities of family members, *other than the names and work-related information of peace and custodial officers.* (B) To preserve the anonymity of whistleblowers, complainants, victims, and witnesses. (C) To protect confidential medical, financial, or other information of which disclosure is specifically prohibited by federal law or would cause an unwarranted invasion of personal privacy that *clearly outweighs* the *strong public interest in records about* possible misconduct and *use of force by peace officers and custodial officers.* (D) Where there is *a specific, articulable, and particularized reason to believe that disclosure of the record would pose a significant danger to the physical safety of the peace officer*, custodial officer, or another person." (§ 832.7, subd. (b)(6)(A)–(D), italics added.) The plain language of these provisions reflects a strong policy favoring the disclosure of work-related information about individual police officers, including their names.

Several of the subdivision (b) redaction provisions allow, but do not require, redaction in specified circumstances. For instance, there is a catchall provision pursuant to which an agency "may redact a record disclosed pursuant to this section, including personal identifying information, where, on the facts of the particular case, the public interest served by not disclosing the information clearly outweighs the public interest served by disclosure of the information." (§ 832.7, subd. (b)(7).) An agency also "may withhold a record of an incident described in paragraph [(b)](1) that is the subject of an active criminal or administrative investigation" in certain circumstances.[11] (§ 832.7, subd. (b)(8).)

---

[11] There is a further provision pertinent to investigations or incidents involving multiple officers which provides, "information about allegations of misconduct by, or the analysis or disposition of an investigation of, an officer

35

Additionally, because this is a CPRA case, that Act's "catchall" exemption from public disclosure also applies. (*Becerra, supra*, 44 Cal.App.5th at pp. 923–929.) This exemption, now codified as Government Code section 7922.000, "permits a public agency to withhold a public record under the CPRA if the agency demonstrates 'that on the facts of the particular case the public interest served by not disclosing the record clearly outweighs the public interest served by disclosure of the record.' " (*Becerra,* at p. 923.) The "exemption ' "contemplates a case-by-case balancing process, with the burden of proof on the proponent of nondisclosure to demonstrate a clear overbalance on the side of confidentiality." ' " (*Ibid*, quoting *American Civil Liberties Union Foundation v. Superior Court* (2017) 3 Cal.5th 1032, 1043.) "[B]ecause the CPRA catchall exemption contemplates a variety of competing public interests including privacy, public safety, and public fiscal and administrative concerns (*American Civil Liberties Union Foundation, . . .* at p. 1043), it may apply more broadly" than some of the specific redaction provisions set forth in section 832.7, subdivision (b). (*Becerra,* at p. 929.)

The practical significance of this, however, is unclear since the pertinent language of the redaction provision set forth in section 832.7, subdivision (b)(7) is identical to the language of the CPRA's catchall

shall not be released pursuant to subparagraph (B), (C), (D), or (E) of paragraph (1), unless it relates to a sustained finding regarding that officer that is itself subject to disclosure pursuant to this section. However, factual information about that action of an officer during an incident, or the statements of an officer about an incident, shall be released if they are relevant to a finding against another officer that is subject to release pursuant to subparagraph (B), (C), (D), or (E) of paragraph (1)." (§ 832.7, subd. (b)(5).) Notably, this provision does not apply to records released pursuant to subdivision (b)(1)(**A**) incidents or findings and therefore does not apply to the records disclosable here under section 832.7, subdivision (b)(1)(A)(i).

exemption from public disclosure.  Since the Legislature is deemed to have acted with knowledge of the existing law, we can only assume that by using language identical to that already included in the CPRA and long construed by the courts, it intended section 832.7, subdivision (b)(7) to have the same scope and import as the CPRA's catchall exemption.  (See *People v. Edwards* (2023) 88 Cal.App.5th 1259, 1276–1277 [" '[w]here, as here, legislation has been judicially construed and a subsequent statute on the same or an analogous subject uses identical or substantially similar language, we may presume that the Legislature intended the same construction, unless a contrary intent clearly appears,' " quoting *Estate of Griswold* (2001) 25 Cal.4th 904, 915–916]; *Garibotti v. Hinkle* (2015) 243 Cal.App.4th 470, 478 ["[w]hen the Legislature uses the same language in a related statute, we presume the Legislature intended the language to have the same meaning," citing *People v. Wells* (1996) 12 Cal.4th 979, 986].)

With this overview, we turn to the manner in which redaction was handled in this case.

It appears that after the trial court ruled on the ACLU's *Pitchess* motion and rejected its argument that the records sought are subject to public disclosure under section 832.7, subdivision (b)(1)(A)(i), the city assumed that issue had been decided, as it devoted its written opposition to the ACLU's motion for judgment to arguing that all the records were personnel records within the meaning of the *Pitchess* statutes and, thus, were confidential under section 832.7, subdivision (a).  The city did not argue that any of the subdivision (b) redaction provisions applied, presumably because it believed the court had already ruled the records were not disclosable under that subdivision.  Nor did it alternatively argue that if the court ruled as it had in connection with the *Pitchess* motion—that some of the records were

not confidential personnel records under the *Pitchess* statutes and thus were public records under the CPRA—exemptions from disclosure under that Act applied.

It further appears that the trial court essentially had the same view— that, in ruling on the *Pitchess* motion, it had rejected the ACLU's argument that section 832.7, subdivision (b)(1)(A)(i) applied and had, instead, ruled the records were, with limited exceptions, confidential officer personnel records under subdivision (a). The court explained, for example, that it had ruled in connection with the *Pitchess* motion that the records it had ordered provided to the ACLU were those that could be segregated from the otherwise confidential personnel records. It expressly reaffirmed that ruling and stated, "I'm not going to relitigate what we've already gone through." In other words, as the trial court explained it, the records it ordered provided to the ACLU under *Pitchess*—because they were segregable from the otherwise confidential officer personnel records—were simply public records, disclosable under the CPRA unless an exemption to disclosure under that Act applied.

This perhaps explains why any discussion of redaction and nondisclosure came up only late in the hearing in response to the superior court's one-sentence statement in its tentative ruling that the "findings" in those portions of the investigative report that would be released would be "anonymized." And even then, there was little substantive discussion of the point.

On appeal, the ACLU's focus is on the redaction of police officer names. As we have recited, the superior court grounded its ruling that officer names be redacted on its determination the names were part and parcel of what it deemed were confidential officer personnel records under section 832.7, subdivision (a). It secondly invoked language found in both the CPRA's

catchall exemption and in section 832.7, subdivision (b)(7)'s catchall redaction provision—that the "public interest" in protecting the identifying information "outweighs the benefit to the public from releasing it." (See Gov. Code § 7922.000; § 832.7, subd. (b)(7).)

While we can say the first ground for the trial court's redaction of officer names was in error—because the records sought are not confidential personnel records under section 832.7, subdivision (a), but are publicly disclosable personnel records under section 832.7, subdivision (b)(1)(A)(i)—we cannot make any final pronouncement as to the redacting of all officer names.

That is because within the over 1,000 pages of responsive records at issue there are many officer names—we have counted at least 50 just in the first few pages of the investigative report—and the context in which names appear indicates named officers fall into different categories. For example, some are identified as officers who received notice that the independent investigation included determining whether they had violated department policies; others as witnesses; others as providing background information.

The question thus arises whether all officer names are subject to disclosure under section 832.7, subdivision (b) or whether a particular officer should, for example, be considered a "whistleblower" or "witness" whose name must be redacted under section 832.7, subdivision (b)(6)(B). Notably, this redaction provision does not expressly exclude police officers, as does the redaction provision for personal data or information that precedes it and is set forth in section 832.7, subdivision (b)(6)(A). As we shall also explain, the weighing of the public's interest in the disclosure of an officer's name versus the interest in not disclosing it, may also differ depending on how and why the officer came to be named in the records.

Rather than resolving these questions, we shall remand the matter for the trial court to address whether any officer's name should be redacted under the subdivision (b) redaction provisions—an issue the court did not squarely address and which the parties did not adequately brief either in the trial court or before this court.[12] (See *Commission on Peace Officer Standards & Training v. Superior Court* (2007) 42 Cal.4th 278, 303 (*Commission on Peace Officer Standards*) [remanding case for determination of whether CPRA exemption applied where "the issue was not fully explored in the superior court"].)

That said, we provide the following discussion for guidance on remand. As we have recited, the mandatory redaction provisions set forth in section 832.7, subdivision (b)(6) weigh against the redaction of information pertaining to peace officers. This is consistent with the significant policy change the Legislature made in 2018 to substantially retract the mantel of confidentiality that previously prohibited the public disclosure of *all* personnel records as defined in the *Pitchess* statutes. Thus, while subdivision (b)(6) requires the redaction of information to "remove personal data or information, such as home address, telephone number, or identities of family members," it expressly excludes from redaction the "names and work-related information of peace and custodial officers." (§ 832.7, subd. (b)(6)(A).) And while subdivision (b)(6) also allows for the redaction of disclosable records for officer safety, it does so only if there is a "specific, articulable, and particularized reason to believe that disclosure of the record would pose a

---

[12] It is not our obligation to comb the record on appeal to locate the information relevant to a party's appeal or, as is the case here, writ petition, and we decline to make our way through the 1,186 pages of material at issue here unassisted by the parties.

significant danger to the physical safety of the peace officer, custodial officer, or another person." (*Id*., subd. (b)(6)(D).)

With respect to the redaction provisions that allow for, but do not require, redaction, the balancing language of section 832.7, subdivision (b)(7) is, as we have observed, identical to that of the CPRA catchall exemption from public disclosure. A number of CPRA cases have addressed the disclosure of police officer names under that Act's catchall exemption and have concluded officer names generally must be disclosed. Given the identical language of section 832.7, subdivision (b)(7), these CPRA cases are equally germane to the scope of this redaction provision. (See *People v. Edwards*, *supra*, 88 Cal.App.5th at pp. 1276–1277 [" '[w]here, as here, legislation has been judicially construed and a subsequent statute on the same or an analogous subject uses identical or substantially similar language, we may presume that the Legislature intended the same construction, unless a contrary intent clearly appears,' " quoting *Estate of Griswold*, *supra*, 25 Cal.4th at pp. 915–916]; accord, *Garibotti v. Hinkle*, *supra*, 243 Cal.App.4th at p. 478 ["[w]hen the Legislature uses the same language in a related statute, we presume the Legislature intended the language to have the same meaning," citing *People v. Wells*, *supra*, 12 Cal.4th at p. 986].) The following are the most significant.

In *New York Times Co. v. Superior Court* (1997) 52 Cal.App.4th 97 (*New York Times*), overruled in part by *Copley Press*, *supra,* 39 Cal.4th at pages 1297–1298, the media company requested the names of officers who fired their weapons during an incident in which a civilian was killed. (*Id.* at p. 99.) The Sheriff's Department had conducted an internal investigation into the incident wherein the identity of the officers was determined, and copies of the report had been placed in the officers' personnel files. (*Ibid.*)

The department released the names of all responding officers, but did not identify which of these officers fired their weapons. (*Id.* at p. 100.) The trial court upheld the department's refusal to disclose the names; the Court of Appeal granted writ relief and ordered disclosure of the identities of the officers. (*Id.* at pp. 99–100.)

The appellate court first concluded the request "simply for the names of officers who fired their weapons" was not a request for the sort of document that was (then) a confidential officer personnel record under the *Pitchess* statutes. (*New York Times*, *supra*, 52 Cal.App.4th at pp. 101–104.) It next considered whether the names could be withheld under the CPRA's catchall exemption and concluded they could not. "Even assuming [Government Code] section [7922.000] to apply, the sheriff cannot prevail. Fear of possible opprobrium or embarrassment is insufficient to prevent disclosure. [Citation.] . . . The perceived harm to deputies from revelation of their names as having fired their weapons in the line of duty and resulting in a death does not outweigh the public interest served in disclosure of their names." (*Id.* at p. 104.) "Law enforcement officers carry upon their shoulders the cloak of authority to enforce the laws of the state," and "[i]n order to maintain trust in its police department, the public must be kept fully informed of the activities of its peace officers." (*Id.* at pp. 104–105.) "Disclosure is all the more a matter of public interest when those officers use deadly force and kill a suspect." (*Id.* at p. 105.)

In *Commission on Peace Officer Standards, supra*, 42 Cal.4th 278, our Supreme Court considered whether the Commission on Peace Officer Standards and Training was required to disclose to the media the names, employing departments, and hiring and termination dates of peace officers. (*Id.* at p. 284.) It first rejected the Commission's claim the information

42

sought qualified as confidential peace officer personnel records under the *Pitchess* statutes. (*Id*. at pp. 289–299.) It then addressed whether CPRA exemptions applied, including the catchall exemption, and concluded none did. (*Id*. at pp. 299–303.)

The high court was not swayed by the Commission's assertion "that in light of the 'dangerous and demanding work' performed by peace officers, releasing such information to the public creates a 'potential for mischief.' " (*Commission on Peace Officer Standards*, *supra,* 42 Cal.4th at p. 301.) The court "readily acknowledge[d] that throughout the state there are some officers working in agencies who, because of their particular responsibilities, require anonymity in order to perform their duties effectively or to protect their own safety. [Citation.] If the duties of a particular officer, such as one who is operating undercover, demand anonymity, the need to protect the officer's safety and effectiveness certainly would justify the Commission in withholding information identifying him or her under" the catchall exemption. (*Ibid*.) The court also recognized the "public has a strong interest in maintaining the safety and efficacy of its law enforcement agencies." (*Ibid*.) But, said the court, " '[t]he prospect that somehow this information in the hands of the press will increase the danger to some . . . cannot alone support a finding in favor of nondisclosure as to all.' " (*Ibid*.) "The safety of peace officers and their families is most certainly a legitimate concern, but the Commission's contention that peace officers in general would be threatened by the release of the information in question is purely speculative. 'A mere assertion of possible endangerment' is insufficient to justify nondisclosure." (*Id*. at p. 302, quoting *CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 652.)

Nor was the court persuaded by the Commission's argument that "persons who were hostile toward law enforcement officers generally (though not toward a particular individual officer) might use the list of names to locate peace officers' addresses through other means (such as Internet resources) and harass them." (*Commission on Peace Officer Standards, supra,* 42 Cal.4th at p. 302.) The Commission "offered no evidence," said the court, "that such a scenario is more than speculative, or even that it is feasible. Furthermore, by virtue of the visibility of their activities in the community, the identity of many officers is well known or readily obtainable. The Commission has not provided any convincing rationale for its assertion that disclosing a comprehensive list of officers' names and employing departments (with the exceptions noted above) would increase the threat to officer safety presented by those with a generalized hostility toward law enforcement officers." (*Id.* at pp. 302–303, fns. omitted.)

More recently, in *Long Beach, supra,* 59 Cal.4th 59, our Supreme Court addressed whether a police department was required to disclose the names of officers involved in a specific officer shooting, as well as the names of officers involved in shootings over a nearly six-year period. (*Id.* at p. 64.) The police officers' association and the city first maintained the names were exempt from disclosure under the *Pitchess* statutes. (*Id.* at pp. 67–68.) They further maintained the CPRA's catchall exemption applied, and submitted a supporting declaration stating that, "revealing the name of an officer involved in a shooting could expose the officer and the officer's family to harassment, because the officer's home address and other personal information could easily be found using the Internet." (*Id.* at pp. 65, 67.) The declaration "further stated that when, for example, an officer is involved in a shooting of a gang member, it is not uncommon for the gang to retaliate

44

against the officer. [The declarant] mentioned eight 'Officer Safety Bulletins . . . about potential retaliation/threats against officers,' two of which were related to shootings, and he also described graffiti in the City of Long Beach that read 'Strike Kill a Cop.' " (*Id.* at p. 65.) The trial court ruled the officer names were disclosable, and the Court of Appeal affirmed. (*Id.* at p. 66.) The Supreme Court agreed. (*Id.* at p. 75.)

The court first concluded the names of the officers, in and of themselves, were not confidential personnel records under the *Pitchess* statutes. (*Long Beach, supra,* 59 Cal.4th at pp. 71–73.) In so concluding, the court commented that the Legislature's intent not "to protect peace officers' identities" could "also be inferred from the Legislature's enactment of Penal Code section 830.10, which requires uniformed officers to display their name or identification number." (*Id.* at p. 72.) "That statute," said the court, "reflects a legislative policy that, generally, the public has a right to know the identity of an officer involved in an on-duty shooting." (*Ibid.*) The court drew a distinction, however, between merely providing the names of officers involved in a shooting and records that "link[] the officer's name, not just to an on-duty shooting, but to a confidential disciplinary action involving the officer." (*Id.* at p. 73.) Such records, said the court, were exempt from disclosure. (*Ibid.*) (Under the 2018 amendments to section 832.7, these records are no longer confidential. Thus, whether an officer's name is "linked" to an administrative investigation of a shooting is immaterial.)

The high court next considered whether CPRA exemptions from disclosure applied, including the catchall exemption. (*Long Beach, supra,* 59 Cal.4th at pp. 73–75.) Again, the court concluded none did. (*Ibid.*) With respect to the catch all exemption, the court rejected the association's and the city's argument that "disclosing the names of peace officers involved in

45

shootings could lead to harassment of those officers and their families," " (*id.* at pp. 74–75) agreeing with the trial court that the association and city "had offered 'no evidence' of a 'specific safety concern regarding any particular officer.' " (*Id.* at p. 75.) The declaration submitted by the city "described the possibility of gang retaliation against officers involved in shooting gang members, but those concerns were general in nature. The [shooting that precipitated the CPRA request] did not involve a gang member, and the Union and the City did not identify other shootings that did involve a gang member. The . . . declaration also mentioned two safety bulletins warning of 'potential retaliation/threats' against officers involved in shootings, and it described graffiti that read 'Strike Kill a Cop,' but those vague concerns do not establish any specific danger to the officers involved in the [shooting at issue] or any shooting that occurred in the six years before" that shooting. (*Ibid.*)

The court went on to say it was not holding "that the names of officers involved in shootings have to be disclosed in every case, regardless of the circumstances." (*Long Beach, supra,* 59 Cal.4th at p. 75.) Rather, it was concluding "that the particularized showing necessary to outweigh the public's interest in disclosure was not made here," where the association and the city "relied on only a few vaguely worded declarations making only general assertions about the risks officers face after a shooting." (*Ibid.,* italics omitted.) The court also pointed out the trial court had denied the association and city's request for injunctive relief prohibiting disclosure of the officer names "without prejudice to any later evidentiary showing that disclosing a particular officer's name would compromise that officer's safety or the safety of the officer's family." (*Ibid.*) This, said the court, permitted "further litigation" by the association and city and appropriately reflected

46

"recognition . . . that the public's interest in access to public records is not absolute and must be weighed against the countervailing privacy and safety interests of peace officers." (*Ibid.*)

In closing, the high court acknowledged there are legitimate "general safety concerns" about "officers who fear retaliation from angry members of the community after an officer-involved shooting, especially when the shooting results in the death of an unarmed person." (*Long Beach, supra,* 59 Cal.4th at p. 75.) "But," said the court, "the Legislature, whose laws we must construe, has not gone so far as to protect the names of all officers involved in such shootings. That the Legislature generally considers it important for the public to know the identities of the officers serving the community is reflected in the statutory provision requiring a uniformed officer to display either a name or an identification number (Pen. Code, § 830.10)." (*Ibid.*)

Under this authority, the trial court's reliance on the CPRA's and section 832.7, subdivision (b)(7)'s catchall language to order the wholesale redaction of officer names cannot be sustained. The city did not present any evidence, by way of declaration or otherwise, in support of withholding officer names under these catchall provisions. Rather, the issue first came up in the superior court's tentative ruling allowing for the release of "anonymized" findings, and after that when the court elaborated on its rejection of the ACLU's argument that the records sought were disclosable under section 832.7, subdivision (b), stating: "What you [the ACLU] keep pushing for . . . is you want to know who did [the badge bending]. It doesn't matter really because for your purposes what you know is that it was done. The report says it was done, and you know how the City handled it. [¶] The next step is a huge one that this court's never going to do. I'll just tell you right now. I'm

not going to put the families of those people, whoever they are even if they did do something like that. The witnesses and even the officers and their families. I'm just not going to put them out there, particularly given the state of mind right now in our society. I'm not going to put them in danger for that. I don't—the balancing act of that does not fall down on there being value to endangering them for what. It doesn't matter. It's important people know this happened. There were bad guys who did things potentially. It comes out that way and you want to get mad . . . at the City if you think they didn't deal with it appropriately. You've got all the pieces."

As the Supreme Court stated in *Long Beach*, there is no question that the personal safety of police officers is important and there is legitimate concern about "retaliation" from "angry members of the community after an officer-involved shooting." (*Long Beach, supra,* 59 Cal.4th at p. 75.) But for more than a decade, our courts, including our Supreme Court, have held these general concerns are insufficient to withhold officer names under the CPRA's catchall exemption, and given the identical language of the redaction provisions of section 832.7, subdivision (b), these cases apply with equal measure here. Accordingly, the directive that all officer names be redacted in this case cannot be sustained on the basis of the superior court's reasoning under the language of the CPRA's catchall exemption or the *Pitchess* statutory redaction provision set forth in section 832.7, subdivision (b)(7).

However, as we have discussed, while some of the officers named in the disclosable records here used lethal or potentially lethal force and thus were the focus of the independent investigation, other officers whose names appear in the records had far more periphery roles. As to these latter officers, the public's interest in the disclosure of their names may not be nearly as weighty as it is with respect to officers who were given notice of the

48

investigation, and the balance could tip towards nondisclosure.  Moreover, as our Supreme Court observed in *Long Beach,* circumstances can change and a "later evidentiary showing" (*Long Beach, supra,* 59 Cal.4th at p. 75), may show with the requisite degree of particularity " 'a clear overbalance on the side of confidentiality' " as to the name of a particular officer.  (*Id.* at p. 67.)  In short, on remand, the parties and the trial court must engage in an exacting examination as to the redaction of the officer names that appear in the records at issue.

We further observe the disclosable records include several drafts of the investigative report.  Subdivision (b)'s provision expressly listing what must be produced does not include "drafts."  (§ 832.7, subd. (b)(3).)  The CPRA, in turn, provides: "Except as provided in Sections 7924.510, 7924.700, and 7929.610, this division does not require disclosure of any preliminary drafts, notes, or interagency or intraagency memoranda that are not retained by a public agency in the ordinary course of business, *if the public interest in withholding those records clearly outweighs the public interest in disclosure.*"  (Gov. Code, § 7927.500, italics added.)  The city never objected that the drafts were not disclosable under either section 832.7, subdivision (b)(3) or the CPRA.  However, the parties seemed to have assumed that drafts would not, in any case, be released.  On remand, the parties and the trial court must also address this issue.

As a final matter, we observe that as to some records, the city asserted attorney client, work product, and deliberative process privileges.  These privilege claims were not briefed in connection with the ACLU's motion for judgment and only scant mention was made of them at the hearing on the motion.  However, the hearing transcript arguably suggests the trial court

left these privilege claims intact.  On remand, the parties and the trial court must address the disposition of these claims, as well.

## DISPOSITION

The ACLU's petition for writ of mandate is granted in part, and city's petition for writ of mandate is, in turn, denied in part.  Let a peremptory writ of mandate issue, directing respondent court to vacate its judgment and order of October 9, 2024, and to conduct further proceedings in accordance with this opinion.  The parties shall bear their own costs.

_____

Banke, J.

We concur:

_____

Humes, P. J.

_____

Langhorne Wilson, J.

A171451/A171570, City of Vallejo v. Superior

Trial Court:Solano County Superior Court

Trial Judge:       Hon. Stephen L. Gizzi

Counsel:

Veronica A.F. Nebb, City Attorney, Katelyn M. Knight, Assistant City Attorney for Petitioner.

No appearance by Respondent.

Covington & Burling LLP, Rani Gupta as Amicus Curiae on behalf of Petitioner.

ACLU Foundation for Northern California, Emi Young and Avram Frey for Real Party in Interest.